## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A GOOGLE PIXEL WITH A CRACKED SCREEN AND BACK WITH IMEI 358327092714042 SEIZED DURING THE ARREST OF KYLE CASSELL AND CURRENTLY LOCATED AT THE FBI PORTLAND RESIDENT AGENCY | No. 2:24-mj-186-KFW |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Jonathan Duquette, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI). I have been in this position since June 2015, and I have been a Task Force Officer in FBI's Boston Division since January 2018. I am also a Border Patrol Agent with the U.S. Border Patrol and have been in this position since December 2009. In my career, I have utilized various investigative tools and techniques, to include the use of search warrants.

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search the Google Pixel cellphone with a cracked screen and back with International Mobile Equipment Identity (IMEI) 358327092714042 ("the Target Device") seized during the arrest of KYLE CASSELL by the Scarborough Police Department on May 21, 2024. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers, other agents, and witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested search warrant.

3.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1) (Distribution or Possession with Intent to Distribute Controlled Substances) and 846 (Attempt and Conspiracy) have been committed by KYLE CASSELL ("CASSELL") and others. There is also probable cause to search the Target Device described and shown in Attachment A for evidence and instrumentalities of these crimes as described in Attachment B.

## PROBABLE CAUSE

4.     For reference, a previous search warrant affidavit has been filed in the United States District Court, District of Maine Case No. 2:24-mj-102-KFW and is attached as Exhibit A. That warrant authorized the search of two Apple iPhones and one TCL cellphone seized from JUSTIN NEVES' girlfriend's apartment in Old Orchard Beach, Maine. Exhibit A incorporates as Exhibit 1, a previous search warrant affidavit filed in the United States District Court, District of Maine Case No. 2:24-mj-54-KFW, which outlines the identification of JOSHUA ESTRADA, YANCARLOS ABRANTE, JASON JOHNSON-RIVERA, and ANTHONY BUTLER as subjects of the investigation.

5.     While reviewing Target Device A (from Exhibit A), I located a Facebook Messenger conversation between Facebook user "Kyle Cassell" (Facebook ID 100087108757345) and Facebook user "Bos Sav (owner)" (Facebook ID 100055865648492)[1] that occurred between February 2, 2024, and March 23, 2024. The

---

[1] As documented in Exhibit A, NEVES' known moniker is "Savage" and he regularly used "Bos," "Sav," or "Savage" in other usernames. Based on the fact that the Facebook profile "Bos Sav" was recovered from NEVES' cellphone plus similarities to other known usernames used by NEVES, I believe Facebook user "Bos Sav" was NEVES.

conversation contained audio calls and text messages. Only the content of the messages was extracted. Below are excerpts from that conversation:



6.      In the first message, CASSELL asked, "You fuck with the low ti [sp] or just up[?]" Based on my training and experience, I know "low" is common terminology referencing a depressant such as heroin or fentanyl and  "up" is common terminology for stimulants such as cocaine or methamphetamine. CASSELL followed the message up with two voice calls that were not extracted during a forensic review,  therefore, the content of those conversations could not  be reviewed. After several hours, NEVES

responded, "Lincoln hotel." CASSELL placed several more voice calls after NEVES'

message. The conversation converted back to messaging including:



7.      As documented in Exhibit A, NEVES' known telephone number was 774-

636-0214 ("0214"). I reviewed call detail records obtained from T-Mobile for 0214

around the time when NEVES wrote, "Hold on calling him[.]" 0214 had contact with

four separate telephone numbers within approximately one minute of writing the

message. Based on the content above, I am unable to determine who or why CASSELL

met someone at the Lincoln Hotel (presumably in Biddeford, Maine). However, based

on references to "low" and "up" I suspect CASSELL was meeting someone to purchase

illegal drugs.

8.      Another Facebook Messenger conversation between CASSELL and NEVES

was recovered from Target Device A that occurred between January 24, 2024, and

March 27, 2024. Again, the conversation contained audio calls and text messages. Only

the content of the text messages was extracted. Below are excerpts from that

conversation:



9.      In the above messages, CASSELL asked NEVES, "How long till new work??" I know the term "work" is a common reference to drugs and or drug sales. CASSELL's reference to "work" leads me to believe CASSELL was purchasing drugs from NEVES. CASSELL also offered to sell or trade two bottles of liquor for the "low,"

likely meaning a depressant like heroin or fentanyl. Their conversation continued on March 16, 2024, as follows:



10.     In the above messages, CASSELL was texting NEVES over several hours telling him he had "plays" waiting or he would be missing out on "plays" if he went to get the "ice maker." I know "play" is a common reference for drug sale. I am also familiar with the term "ice" to reference methamphetamine. However, based on the messages reviewed I cannot determine if CASSELL was offering an actual ice maker or illegal drugs to NEVES. Their conversation continued on March 24, 2024, as follows:



11.    In the above messages CASSELL asked, "Can I grab something.?" NEVES never replied to CASSELL's question, however CASSELL and NEVES had several audio calls over the next couple days, of which as stated above, the content was not extracted.

12.    Based on the previous references to "low," "up," and "work," I believe CASSELL's reference to "something" was CASSELL asking to buy illegal drugs from NEVES. Based on CASSELL's previous references to "plays," I believe CASSELL was selling drugs and was likely purchasing some of those drugs from NEVES.

13.    Also, from Target Device A, I located a text message conversation between NEVES utilizing 0214 and contact "Sheila" utilizing telephone number 207-318-5350. I know this contact ("Sheila) to be SHEILA T-SREY, who is NEVES' girlfriend. On January 20, 2024, NEVES and T-SREY had the following conversation:



From: +7746360214 _$!<Other>!$_ (owner)
To: +12073185350 Sheila

Find out where he is so I can crush him

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +12073185350 Sheila | 1/21/2024 4:26:26 AM(UTC+0) | 1/21/202 4 4:26:28 AM(UTC +0) | |

Status: Sent

1/21/2024 4:26:25 AM(UTC+0)

Source Extraction:
Legacy



From: +12073185350 Sheila
To: +7746360214 _$!<Other>!$_ (owner)

Kyle will tell me he hates Glizzy and Josh

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +17746360214 _$!<Other>!$_ | | 1/21/202 4 4:26:45 AM(UTC +0) | |

Status: Read

1/21/2024 4:26:45 AM(UTC+0)

Source Extraction:
Legacy



From: +7746360214 _$!<Other>!$_ (owner)
To: +12073185350 Sheila

Huh

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +12073185350 Sheila | 1/21/2024 4:27:00 AM(UTC+0) | 1/21/202 4 4:27:01 AM(UTC +0) | |

Status: Sent

1/21/2024 4:27:00 AM(UTC+0)

Source Extraction:
Legacy



From: +12073185350 Sheila
To: +17746360214 _$I<Other>I$_ (owner)

**Jug**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +17746360214 _$I<Other>I$_ | | 1/21/2024 4:27:06 AM(UTC+0) | |

**Status:** Read

1/21/2024 4:27:05 AM(UTC+0)

Source Extraction:
Legacy

From: +12073185350 Sheila
To: +17746360214 _$I<Other>I$_ (owner)

**Glizzy was choking him**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +17746360214 _$I<Other>I$_ | | 1/21/2024 4:27:12 AM(UTC+0) | |

**Status:** Read

1/21/2024 4:27:12 AM(UTC+0)

Source Extraction:
Legacy

From: +17746360214 _$I<Other>I$_ (owner)
To: +12073185350 Sheila

**Ok so see**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +12073185350 Sheila | 1/21/2024 4:27:15 AM(UTC+0) | 1/21/2024 4:27:15 AM(UTC+0) | |

**Status:** Sent

1/21/2024 4:27:15 AM(UTC+0)

Source Extraction:
Legacy



14.    In the above messages, NEVES was trying to locate, "him." I believe

NEVES was referring to JOSHUA ESTRADA. T-SREY suggested she could find out

through "Kyle" because he ("Kyle") hated "Glizzy" and "Josh." As documented in Exhibit

1, "Glizzy" is the known moniker for YANCARLOS ABRANTE. T-SREY wrote that "Kyle"

had been choked by ABRANTE over $200. T-SREY sent NEVES a photograph, which is

depicted below:



15.     After reviewing the photograph sent from T-SREY to NEVES, I recognized the individual in the photograph as CASSELL and the photograph depicts the words "Kyle Cassell." I know from my involvement in the investigation into ESTRADA, ABRANTE, and others, that they were distributing drugs in the Saco/Biddeford area. I suspect CASSELL had obtained $200 worth of drugs from ESTRADA and/or ABRANTE and when he did not pay, ABRANTE chocked him.

16.     Also, from Target Device A, I located a text message conversation between NEVES utilizing 0214 and contact "Shawn" utilizing telephone number 207-615-9052 ("9052"). Open-source research on 9052 identified the user as Shawn Andrews. On January 26, 2024, ANDREWS sent NEVES the following message:



17.      FBI TFO and Saco Detective Ryan Hatch identified Shawn Andrews cousin as Andrew Gagne. On April 22, 2024, TFO Hatch and I conducted a telephonic interview with GAGNE who indicated he had sold the safe to CASSELL approximately two months or longer ago.

18.      On May 21, 2024, officers with the Scarborough Police Department attempted to conduct a traffic stop on a U-Haul van at the Nouria gas station located at 284 Payne Road, Scarborough, Maine. The driver of the U-Haul van fled while officers approached and drove recklessly before abandoning the vehicle in a nearby business. Officers determined the U-Haul van was being operated by CASSELL when it fled the traffic stop. CASSELL had five warrants for his arrest during the time of the attempted stop for the following: Theft by unauthorized taking, Failure to appear (FTA) Unlawful possession of a scheduled drug, FTA theft by unauthorized taking, FTA operating while license suspended or revoked, and FTA theft by unauthorized taking. Officers determined CASSELL fled from the U-Haul van on foot and he eluded officers for several hours in the woods before ultimately being apprehended. CASSELL asked the apprehending officers to retrieve his cellphone from the ground where he was apprehended. A photograph of the Target Device appears below.



19.     CASSELL was arrested on his warrants and transported to the Cumberland County Jail (CCJ). CASSELL was issued summons for the following: Criminal operating a vehicle after suspension, Failure to stop for a law enforcement officer, Eluding, Criminal speed, Driving to endanger, Reckless conduct, and Refusing to submit. I collected the Target Device from a Scarborough police officer at the CCJ pending a search warrant. The Target Device is stored at the FBI Portland Resident Agency.

20.     I conducted a post *Miranda* interview of CASSELL while he was incarcerated at the CCJ. CASSELL admitted to selling NEVES a safe that he had purchased from GAGNE. CASSELL said he delivered the safe to T-SREY at her condominium in Old Orchard Beach. CASSELL said he made the arrangements to sell the safe to NEVES in person. CASSELL denied purchasing drugs from ESTRADA, ABRANTE, or NEVES. As documented in Exhibit A, during a probation search at T-SREY's apartment, a safe was discovered that contained a firearm and ammunition.

## TECHNICAL TERMS

21.    Based on my training and experience, I use the following technical terms
to convey the following meanings:

    a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular

        telephone) is a handheld wireless device used for voice and data

        communication through radio signals. These telephones send signals

        through networks of transmitter/receivers, enabling communication with

        other wireless telephones or traditional "land line" telephones. A wireless

        telephone usually contains a "call log," which records the telephone

        number, date, and time of calls made to and from the phone. In addition to

        enabling voice communications, wireless telephones offer a broad range of

        capabilities. These capabilities include: storing names and phone numbers

        in electronic "address books;" sending, receiving, and storing text

        messages and e-mail; taking, sending, receiving, and storing still

        photographs and moving video; storing and playing back audio files;

        storing dates, appointments, and other information on personal calendars;

        and accessing and downloading information from the Internet. Wireless

        telephones may also include global positioning system ("GPS") technology

        for determining the location of the device.

    b.  Digital camera: A digital camera is a camera that records pictures as digital

        picture files, rather than by using photographic film. Digital cameras use a

        variety of fixed and removable storage media to store their recorded

        images. Images can usually be retrieved by connecting the camera to a

        computer or by connecting the removable storage medium to a separate

14

reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.   Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A

GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

22.  Based on my training, experience, and research, I believe that the Target Device has capabilities that allow it to serve as wireless telephones, digital cameras,

16

portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, websites and other content that have been viewed via the Internet are typically stored for some period of time on the accessing device. This information can sometimes be recovered with forensics tools.

24.     Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able

to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

25.    *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

26.    *Manner of execution*. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

27.   I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Device described and shown in Attachment A to seek items described in Attachment B.

Respectfully submitted,

Jonathan Duquette
Task Force Officer
Federal Bureau of Investigation

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedures

Date:   Jun 10 2024

City and state:   Portland, Maine

_Judge's signature_

Karen Frink Wolf,   U.S. Magistrate Judge
_Printed name and title_

19